UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA,

    -against-

NICHOLAS CARVER,

                 Defendant.
-------------------------------X

MEMORANDUM & ORDER
22-CR-316 (JS)

APPEARANCES

For United States:  Michael R. Maffei, Esq.
                     United States Attorney's Office
                     Eastern District of New York
                     610 Federal Plaza
                     Central Islip, New York 11722

For Defendant:      John H. LoTurco, Esq.
                     Matthew B. Keller, Esq.
                     Barket Epstein Kearon Aldea & LoTurco LLP
                     666 Old Country Road, Suite 700
                     Garden City, New York 11530

SEYBERT, District Judge:

        Nicholas Carver ("Defendant") moves: (1) to dismiss Count One of the Indictment, charging Defendant with transportation of child pornography under 18 U.S.C. § 2252(a)(1) and (b)(1) (see Indictment, ECF No. 1), or in the alternative, for a bill of particulars identifying the Government's theory as to how Defendant is guilty of such crime (hereafter, the "Dismissal Motion") (see ECF No. 28); and (2) to suppress all oral or written statements, including an online consent form, and the fruits thereof, made or executed by Defendant on March 17, 2022, or, alternatively, for an evidentiary hearing on suppression

1

(hereafter, the "Suppression Motion") (see ECF No. 31) (together with the Dismissal Motion, the "Motions"). (See Memorandum of Law in Support of Dismissal Motion ("Dismissal Support Memo"), ECF No. 29; Memorandum of Law in Support of Suppression Motion ("Suppression Support Memo"), ECF No. 32.)  For the reasons below, Defendant's Motions are DENIED in their entirety.

BACKGROUND[1]

I.    The Search of Defendant's Home

       On March 14, 2022, Magistrate Judge Lindsay issued a search warrant authorizing a search of Defendant's home for "a detailed list of 16 different categories of evidence." (Suppression Support Memo at 3; Ex. 1, ECF No. 31-2, attached to Keller Decl. ECF No. 31-1.)  On March 17, 2022, at approximately 7:30 a.m. to 7:45 a.m.[2], law enforcement officers from the Federal Bureau of Investigation ("FBI") and the Suffolk County Police Department ("SCPD") executed a search of Defendant's residence. During the search, two law enforcement officers, Special Agent ("SA") Colleen Sheehan of the FBI and Task Force Officer

---

[1] The facts are recited as relevant to the Court's analysis and are drawn from the Case Docket, the Indictment, and the parties' submissions relative to the instant Motions.  Further, numbered exhibits are those of the Defendant and lettered exhibits are those of the Government.

[2] The parties dispute the timing of the execution of the warrant. Defendant contends law enforcement officers began knocking on his door at 7:30 a.m., (see Suppression Support Memo at 3.), while the Government contends law enforcement officers executed the warrant at 7:45 a.m. (see Opp'n, ECF No. 33, at 4.)

("Officer") Daniel Fandrey of the SCPD, interviewed Defendant. During the course of the interview, Defendant made oral and written admissions, and authorized FBI agents to assume his online identity in furtherance of their investigation.  (Opp'n at 6.)

The parties dispute whether Defendant was issued warnings pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), before he made incriminating admissions and whether Defendant "voluntarily" authorized the FBI to assume his online identity.

A. <u>The Government's Account of Events Concerning Defendant's Oral and Written Statements</u>

The Government asserts law enforcement officers executed the search warrant on Defendant's home at approximately 7:45 a.m. on March 17, 2022.  (Opp'n at 4.)  According to the Government, Defendant was promptly Mirandized at 7:49 a.m., immediately prior to being questioned. (<u>Id.</u> at 4-5.)  SA Sheehan and Officer Fandrey informed Defendant of his <u>Miranda</u> rights both orally and by providing him with a pre-printed form advising Defendant of his rights (the "Advice of Rights Form"), which Defendant signed at 7:49 a.m. (<u>Id.</u> at 5; Ex. A, ECF No. 33-1, <u>attached to</u> Opp'n.)  SA Sheehan and Officer Fandrey asked Defendant to read a portion of the Advice of Rights Form out loud, and, when asked if he understood his rights, Defendant responded, "yes."  (<u>See id.</u>) Thereafter, Defendant was interviewed by law enforcement officers, during which he made extensive admissions to law enforcement.

(Id.)  In particular, Defendant admitted to: (1) engaging in chats with, sending photos of his genitals to, and receiving nude photos from, children between the ages of 13 and 16; (2) sending and receiving pictures of child pornography; and (3) saving child pornography to his Google and MEGA accounts.  (Id. at 2, 6; Ex. B, ECF No. 33-2, attached to Opp'n.)  These admissions were memorialized by a law enforcement agent in a written statement and read aloud to Defendant to ensure accuracy.  (See id. at 6.) Defendant was given the opportunity to review the written statement, at which time Defendant made corrections and placed his initials next to the corrections he made.  (Id.; see also Ex. B.) Defendant then signed the written statement.  (See id.; see also Ex. B.)

Thereafter, law enforcement asked Defendant if he would grant them permission to use his online identity to assist with other child pornography investigations. (Opp'n at 6.)  Defendant consented to their request orally and by signing an FBI Consent to Assume Online Identity Authorization Form ("Online Identity Consent Form").  (Id.; Ex. C, ECF No. 33-3, attached to Opp'n.) At the same time Defendant was reviewing the Online Identity Consent Form, Defendant asked Officer Fandrey if signing the form would help him in any way.  (See id.)  In sum and substance, Officer Fandrey responded "that any cooperation with law enforcement at this stage could demonstrate willingness to assist

law enforcement and try to help himself." (<u>Id</u>. at 6-7.) A few weeks later, Defendant met with SA Sheehan to retrieve electronic devices seized pursuant to the search warrant. (<u>See</u> <u>id</u>. at 7.) During the meeting, SA Sheehan asked Defendant if he would consent to the search of additional online accounts he possessed which were relevant to the investigation (<u>see</u> <u>id.</u>); Defendant agreed and executed a Consent to Search Form. (<u>Id</u>.; Ex. E, ECF No. 33-5, <u>attached to</u> Opp'n.)

B. <u>Defendant's Account of Events Concerning His Oral and Written Statements</u>

Defendant claims that law enforcement officers arrived at his home on March 17, 2022, at approximately 7:30 a.m. (<u>See</u> Suppression Support Memo at 3.) At the time law enforcement arrived, Defendant was using the bathroom, and, in rushing to answer the door, neglected to flush the toilet. (<u>See</u> <u>id.</u> at 3-4; <u>see also</u> Carver Decl., ECF No. 31-5, at ¶ 5.) Upon answering the door, law enforcement officers began filing into Defendant's home. (<u>See</u> <u>id.</u> at 3; <u>see also</u> Carver Decl. ¶ 7.) SA Sheehan and Officer Fandrey took Defendant into a small office adjoining the hallway and began questioning him. (<u>See</u> <u>id.</u>; <u>see also</u> Carver Decl. ¶¶ 7-8.) Defendant contends that 15-to-20 minutes later, he was ushered to the second floor and instructed to sit on his couch with law enforcement officers sitting on each side of him. (<u>See</u> <u>id.</u>; <u>see also</u> Carver Decl. ¶ 9). A uniformed officer was "stationed at the

5

top of the staircase" such that Defendant could not have exited the house without walking past that uniformed officer.  (<u>Id.</u> at 4; <u>see also</u> Carver Decl. ¶ 11.)  Once seated, Defendant told the law enforcement officers that he needed to go to work; in response, one officer replied that Defendant would "not be going to work" that day.  (<u>Id.</u>)  Defendant then remembered that he did not flush the toilet earlier and, therefore, asked the officers if he could go to the restroom to do so.  (<u>See id. at 3-4</u>; <u>see also</u> Carver Decl. ¶ 10.)  His request was denied with Defendant being told to "stay on the couch."  (<u>Id.</u>)  Defendant alleges he was then questioned for another hour, and "near the end of questioning" was asked to sign a consent form.  (<u>Id.</u> at 4; Carver Decl. ¶¶ 12-13)

Defendant "does not recall executing a <u>Miranda</u> waiver on March 17[, 2022]" but "acknowledges signing some documents" during the course of his interview with SA Sheehan and Officer Fandrey. (Suppression Support Memo at 10.)  He further disputes that he signed the Advice of Rights Form at 7:50 a.m.[3]  (<u>See id.</u>; <u>see also</u> Ex. A.)  Rather, Defendant contends that officers questioned him for "at least half an hour" before "he was asked to sign any evidence or other documents."  (<u>Id.</u>; <u>see also</u> Carver Decl. ¶ 14.) Defendant further claims that "near the end of questioning" he was

---

[3] The Advice of Rights form contains two times at which it could have been signed: "7:49" and "7:50".  Defendant contends, because the times listed do not include the designations "a.m." or "p.m.", he is entitled to a suppression hearing on that issue alone.  The Court disagrees for the reasons stated <u>infra</u>.

asked to "sign a consent form authorizing [law enforcement] to search and otherwise use his online accounts."  (Id. at 4; see also Carver Decl. ¶ 13.)  Defendant alleges he was told signing the consent form would "make [him] look good in the judge's eyes and things would be easier for [him]."  (Id.)  Defendant was not permitted to call his wife until the search was concluded.  (See id. at 8; see also Carver Decl. at ¶ 18.)

II.  Procedural History

   A.  The Indictment

      On July 13, 2022, a grand jury returned an indictment charging Defendant with one count of transportation of child pornography in violation of 18 U.S.C. §§ 2552(a)(1) and 2252(b)(1) ("Count One"), and two counts of possession of child pornography in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2) ("Counts Two and Three," respectively).  (See generally, Indictment.)  Count One, which is the subject of Defendant's Dismissal Motion, describes Defendant's acts as follows:

> On or about September 13, 2021, within the
> Eastern District of New York and elsewhere,
> the defendant NICHOLAS CARVER did knowingly
> and intentionally transport and ship, using a
> means and facility of interstate and foreign
> commerce and in and affecting interstate and
> foreign commerce, one or more visual
> depictions, to wit: images depicted in digital
> files uploaded to a Google account controlled
> by CARVER, the production of such visual
> depictions having involved the use of one or
> more minors engaging in sexually explicit

conduct and such visual depictions were of
such conduct.

(Indictment at 1.)

Count Two of the Indictment states:

On or about September 30, 2021, within the
Eastern District of New York and elsewhere,
the defendant NICHOLAS CARVER did knowingly
and intentionally possess matter containing
one or more visual depictions, to wit: images
depicted in digital files in a Google account
controlled by CARVER, in and affecting
interstate and foreign commerce, and which
visual depictions had been mailed, and shipped
and transported using a means and facility of
interstate and foreign commerce, and which
were produced using materials which had been
mailed, and so shipped and transported, by any
means including by computer, the production of
such visual depictions having involved the use
of one or more minors engaging in sexually
explicit conduct, and such depictions were of
such conduct.

(Id. at 2.)

Count Three of the Indictment states:

On or about March 17, 2022, within the Eastern
District of New York and elsewhere, the
defendant NICHOLAS CARVER did knowingly and
intentionally possess matter containing one or
more visual depictions, to wit: images
depicted in digital files in a MEGA account
controlled by CARVER, in and affecting
interstate and foreign commerce, and which
visual depictions had been mailed, shipped and
transported using a means and facility of
interstate and foreign commerce, and which
were produced using materials which had been
mailed, and so shipped and transported, by any
means including by computer, the production of
such visual depictions having involved the use
of one or more minors engaging in sexually

8

explicit conduct, and such visual depictions
were of such conduct.

(Id. at 2-3.)

B. The Dismissal Motion

On July 10, 2023, Defendant filed the instant Dismissal
Motion seeking dismissal of Count One of the Indictment.  Defendant
argues: (1) "Count One fails to allege that Mr. Carver transported
child pornography as opposed to merely possessing child
pornography" because "a necessary element of the offense" is that
the Defendant makes the "images available to others;" and (2)
alternatively, a bill of particulars is required because the
Government "fail[s] to provide any information as to how
[Defendant] made any of the allegedly contraband images on the
subject Google account available to others" and how Defendant's
"alleged conduct with respect to Count One differs from the conduct
associated with the simple possession crimes charged in Counts Two
and Three."  (Dismissal Support Memo at 5, 7.)  Defendant contends
because he uploaded the prohibited images to his personal Google
drive, his conduct does not amount to "transport[ation]" within
the meaning of 22 U.S.C. § 2252(a)(1) (the "Transportation
Statute").  He further argues that Congress did not intend to
punish defendants for possession under the Transportation Statute,
because that statute imposes a five-year mandatory minimum

9

imprisonment for violators, whereas the possession statute, § 2252(a)(4)(B), has no mandatory minimum. (Id. at 3.)

On October 19, 2023, the Government filed its omnibus Opposition to Defendant's Dismissal Motion and later-filed Suppression Motion. (Opp'n, ECF No. 33.) With regard to Defendant's Dismissal Motion, the Government argued that Count One need not be dismissed because: (1) it is facially valid, as it "cites to and tracks the language of the relevant statutes and specifically identifies the elements of the offense charged, as well as the time period, location and nature of the crime alleged [including] the nature of the images and act of transportation"; and (2) in the absence of Second Circuit law on this issue, this Court should follow the law of other circuit courts which have found that uploading child pornography to an cloud-based storage system constitutes "transport[ation]" within the meaning of 22 U.S.C. § 2252(a)(1). (Id. at 9.)

C. The Suppression Motion

On September 15, 2023, Defendant filed the instant Suppression Motion, seeking suppression of any oral or written statements made on March 17, 2022, and any and all evidence obtained pursuant to the Online Identity Consent Form purportedly executed on that date. Alternatively, Defendant requests an evidentiary hearing on suppression. Defendant argues: (1) the officers' questioning of him in his home amounted to a custodial

interrogation; (2) he did not timely or validly waive his <u>Miranda</u> rights, because the law enforcement officers informed him of his rights "during the latter portion" of an hour-long interrogation; and (3) the Online Identity Consent Form was not voluntarily and freely signed. (Suppression Support Memo at 7, 10-13.) In its Opposition, the Government argues Defendant: (1) was not in custody during his interview with law enforcement; (2) was properly Mirandized prior to his interview and Defendant's not remembering being Mirandized is of no consequence; and (3) voluntarily consented to law enforcement assuming his online identity.

DISCUSSION

I.   <u>Defendant's Motion to Dismiss Count One of the Indictment</u>

A person is guilty of the crime of transportation of child pornography under 18 U.S.C. § 2252(a)(1) if he "knowingly transports or ships using any means or facility of interstate or foreign commerce . . . including by computer or mails any visual depiction" of a minor child engaging in sexually explicit conduct. § 2252(a)(1). The parties dispute the meaning of "transportation" under the statute. Defendant contends that, to be lawfully charged with a crime under the statute, the Government must allege the illegal depiction was transported from Defendant <u>to another individual</u>. (Dismissal Support Memo at 4.) Because the Government does not allege Defendant transmitted illegal images to another individual, Defendant asserts Count One of the Indictment must be

11

dismissed.    In  contrast,  the  Government  contends  the  statute
requires  only  that  Defendant  transported  the  illegal  images  <u>to
another place</u>,  including  a  virtual  storage  space,  and  that  the
Government  need  not  prove  another  <u>person</u>  received  such  images.
(Opp'n  at  10-13.)    In  the  absence  of  Second  Circuit  case  law
squarely  addressing  this  issue,  in  conjunction  with  the  well-
reasoned  case  law  of  the  Fourth,  Sixth,  and  Tenth  Circuits,  and
upon  review  of  the  plain  language  of  the  statute,  this  Court  finds
that  a  defendant  can  "transport"  child  pornography  in  violation  of
18  U.S.C.  §  2252(a)(1)  by  uploading  the  illegal  images  to  a  web-
based  storage  platform  even  in  the  absence  of  evidence  that  the
defendant  shared  or  intended  to  share  such  images  with  another
person.    Accordingly,  Count  One  of  the  Indictment  sets  forth  a
valid  charge  for  the  crime  of  Transportation  of  Child  Pornography
under  18  U.S.C.  2252(a)(1);  hence  Defendant's  Dismissal  Motion  is
denied.

     A. <u>Legal Standard</u>

          A  defendant  may  move  to  dismiss  an  indictment  under  Rule
12(b)  of  the  Federal  Rules  of  Criminal  Procedure  where,  <u>inter alia</u>,
it  lacks  specificity  or  fails  to  state  a  criminal  offense.    FED.
R. CRIM. P. 12(b)(3)(B);  <u>United States v. Aleynikov</u>,  676  F.3d  71,
75-76  (2d  Cir.  2012)  ("[A]  federal  indictment  can  be  challenged  on
the  ground  that  it  fails  to  allege  a  crime  within  the  terms  of  the
applicable  statute.").    As  a  general  matter,  "[a]n  indictment  is

sufficient when it contains the elements of the offense charged, fairly informs a defendant of the charge against which he must defend, and includes enough detail that the defendant may plead double jeopardy in a future prosecution based on the same set of events." United States v. Rosado, No. 21-CR-0003, 2021 WL 2292856, at *1 (S.D.N.Y. June 4, 2021) (citing United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (internal quotation marks omitted)). "As a result, the Second Circuit has consistently upheld indictments that do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Hwa, No. 18-cr-0538, 2021 WL 11723583, at *12 (E.D.N.Y. Sept. 3, 2021) (citing United States v. Ghayth, 709 F. App'x 718, 723 (2d Cir. 2017) (internal quotation marks omitted)).

In evaluating a motion to dismiss, "[c]ourts must accept as true the allegations in the indictment." United States v. Marsalis, 314 F. Supp. 3d 462, 465 (E.D.N.Y. 2018). However, the court is not permitted to look beyond the face of the indictment and draw inferences as to the proof that would be introduced by the government at trial. United States v. Larson, 807 F. Supp. 2d 142, 151 (W.D.N.Y. 2011) (cleaned up), aff'd sub nom. United States v. Kirsch, 903 F.3d 213 (2d Cir. 2018) (citing United States v. Alfonso, 143 F.3d 722, 776 (2d Cir. 1998)(internal quotation marks omitted)).

B. <u>Analysis</u>

    1. <u>Second Circuit Guidance</u>

The Second Circuit has not squarely addressed whether a defendant may be charged with "knowingly transporting" child pornography under 18 U.S.C. § 2252(a)(1) where the defendant has uploaded child pornography to a web-based storage platform to which others did not have access.  The closest it has come to addressing this issue was in <u>United States v. Clarke</u>, 979 F.3d 82 (2d Cir. 2020).  There, the defendant was charged with transportation of child pornography under 18 U.S.C. § 2252(a)(1) based upon his use of a BitTorrent program, a peer-to-peer file-sharing program which "allows a user to download files directly from the computers of others in the network."  <u>Clarke</u>, 979 F.3d at 87.  The Second Circuit held there was sufficient evidence to support the defendant's conviction for transportation of child pornography because the defendant knew "by downloading the files to his computer through [the file-sharing program] and maintaining them in a shared folder, he took steps that would result in the movement of the files via the internet to the computers of others whenever network sharers downloaded them," thus satisfying the knowledge requirement of 18 U.S.C. § 2252(a)(1).  <u>Id.</u> at 91.  The <u>Clarke</u> Court further held the defendant's actions constituted transportation because he "knowingly and intentionally join[ed] the file-sharing network, download[ed] files from the computers of

14

other network users to his own, stor[ed] those files in a folder that was shared with other network users, and maintain[ed] his folder's connection to the network." Id. at 94. The Clarke defendant thus committed the act of transporting child pornography when, "as anticipated, another user of the file-sharing network caused the files [stored in the defendant's folder] to be downloaded and sent from his computer to another's computer." Id.; see also United States v. Davis, 859 F.3d 429 (7th Cir. 2017) (affirming conviction under the transportation statute where defendant uploaded child pornography to a Shutterfly folder to which approximately 50 others had access). Hence, Clarke makes clear that where a defendant knowingly makes child pornography available to others via a web-based platform, he may be appropriately charged with "transporting" child pornography under § 2252(a)(1). However, contrary to Defendant's assertions, Clarke does not address whether a person who knowingly uploads child pornography to a web-based platform, without any intent to share it with others, is likewise guilty of same.

Despite the lack of Second Circuit guidance on this issue, at least one District Court within the Circuit, i.e., the District of Connecticut, has been presented with a defendant charged under the transportation statute where, as here, that defendant uploaded child pornography to a personal account or folder on a web-based platform. In that case the defendant was

15

charged with transporting child pornography under § 2252(a)(1) based upon his uploading of child pornography "to his personal Google Photos folder."[4]  In re United States, 945 F.3d 616, 621 n.1 (2d Cir. 2019) (noting these facts had "not yet been admitted into evidence in the district court," but that for purposes of the Circuit Court's ruling on the Government's petition for a writ of mandamus on an unrelated issue, the parties did not dispute the facts); see also generally United States v. Manzano, No. 3:18-CR-0095, Indictment (D. Conn. May 2018) (underlying case with analogous facts to the instant case).  Moreover, as discussed infra, courts in several other jurisdictions have expressly permitted the Government to charge a defendant with transportation of child pornography in the absence of evidence indicating the child pornography was received by another individual.

### 2. Persuasive Guidance from Other Jurisdictions

The Fourth and Tenth Circuits have explicitly held a defendant can be charged under the Transportation Statute where the defendant transported prohibited images to another place, including via the internet, regardless of whether another individual received the images.  The Sixth Circuit has also upheld a defendant's conviction under similar circumstances.  Each of those relevant decisions is discussed in turn, below.

---

[4] The Court notes that defendant Manzano ultimately plead guilty to the crime of transporting child pornography under 18 U.S.C. § 2252(a)(1).  United States v. Manzano, No. 3:18-CR-0095, Plea Agreement, ECF No. 146 (Conn. May 2018).

In _United States v. Fall_, the Fourth Circuit unequivocally held that "Transportation [under § 2252(a)(1)] does not require conveyance to another person." 955 F.3d 363, 374 (2020). There, the defendant was charged with transportation of child pornography by virtue of his uploading an illicit video to his personal account on the online storage platform Dropbox. _Id._ The defendant argued he could not be charged with transportation within the meaning of the statute because "there was no evidence that he shared, attempted to share or even intended to share the video." _Id._ The _Fall_ Court rejected the defendant's argument, reasoning his uploading of the video to Dropbox was no different than a person physically transporting child pornography across state lines. _Id._ (citing _United States v. Ickes_, 393 F.3d 501, 501 (4th Cir. 2005) (affirming defendant's conviction for transportation of child pornography where he physically brought the images from Canada to Virginia)). The _Fall_ Court held, "even if the government presented no evidence that anyone other than [defendant] accessed the file-sharing account," defendant's uploading of the prohibited video to the online file-sharing website was sufficient to sustain a conviction for transportation of child pornography. _Id._ at 375.

The Tenth Circuit reached the same conclusion in _United States v. Wasson_. 847 F. App'x 523 (2021). In so reaching, the _Wasson_ Court examined the plain meaning of the word "transport,"

17

and the statutory interpretation adopted by other circuit courts. Id. at 525 ("In defining 'transport' in other contexts, we have consistently applied the term's ordinary meaning, to 'convey from one person or place to another' . . . . Interpreting the statute at issue, other circuits have held that child pornography is transported when it begins in one location and is uploaded to a different location." (internal citations omitted)). Accordingly, the Tenth Circuit held that a person may be found guilty of transportation of child pornography under § 2252(a)(1) if a juror were to find beyond a reasonable doubt that "child pornography began in the defendant's possession and was conveyed to another location or another person.  This burden can be met through evidence that the images were uploaded to a website."  Id. (emphasis added).

Moreover, the Sixth Circuit similarly affirmed the conviction of a defendant under the Transportation Statute based upon his uploading of child pornography to his Radar.net account. Although the defendant did not argue he lacked intent to share these documents with others, as the defendants did in Fall and Wasson, the Court concluded that "the government presented sufficient evidence establishing the defendant uploaded the images to [his] account" and, thus, upheld defendant's conviction under the Transportation Statute.  United States v. Clingman, 521 F. App'x 386, 396 (6th Cir. 2013).

The well-reasoned case law established in the Fourth, Sixth, and Tenth Circuits is persuasive, warranting its application here.  Count One of the Indictment alleges Defendant transported child pornography to a Google account he controlled. As the Fourth, Sixth, and Tenth Circuits have made clear, such transportation of illegal images to a web-based storage platform, even absent an intent to share the images with others, is sufficient to sustain a conviction for transportation of child pornography under 18 U.S.C. § 2252(a)(1).  Indeed, Defendant has not cited a single case where a defendant's transfer of child pornography to a web-based platform was insufficient evidence of transportation under § 2252(a)(1).  Accordingly, the Court finds Defendant has been appropriately charged with transportation of child pornography as alleged in Count One of the Indictment.

### 3. The Plain Meaning of "Transport"

The Court's decision to uphold Count One of the Indictment is further supported by the plain meaning of the language of the Transportation Statute.  See United States v. Davis, 648 F.3d 84, 89 (2d Cir. 2011) ("It is axiomatic that the plain meaning of a statute controls its interpretation.") (citations omitted); Greathouse v. JHS Sec. Inc., 784 F.3d 105, 111 (2d Cir. 2015) ("A statute generally should be enforced according to its plain and unambiguous meaning." (internal citations and quotation marks omitted)).  Count One of the

19

Indictment charges Defendant with transporting child pornography under 18 U.S.C. § 2252(a)(1). (Indictment at 1.) Section 2252(a)(1) of Title 18 of the U.S. Code states that a person is guilty of the crime of transportation of child pornography when the person "knowingly transports or ships using any means or facility of interstate or foreign commerce" any depiction of child pornography. In Clarke, the Second Circuit examined the plain meaning of the word "transport," which means "to move something from one place to another." 979 F.3d at 93 n.6.; see also Transport, THE MERRIAM-WEBSTER DICTIONARY, http://merriamwebster.com/dictionary/transport (last visited Jan. 3, 2023) (defining "transport" as "to transfer or convey from one place to another"). The Second Circuit has further opined that one may "transport" child pornography within the meaning of § 2252(a)(1) via the internet. Clarke, 979 F.3d at 93 n.6 ("Under § 2252, child pornography can be "transport[ed]"—that is, moved from one place to another—electronically via the internet.").

Thus, the plain meaning of the word "transport" makes clear that, within the meaning of 18 U.S.C. § 2252(a)(1), a person may "transport" child pornography when he moves the illegal images from one place, like a desktop, to another place, like a web-based storage platform. Notably absent from any definition of "transport" is the requirement that an individual be present to receive whatever is being transferred. Indeed, the common meaning

20

of the word transport does not require the existence of a recipient at all. Rather, one may transport material to <u>another place</u> without the need to transport it to <u>another person.</u> Hence, pursuant to the tenants of statutory interpretation, the plain meaning of the word "transport" permits Defendant to be charged with transporting child pornography based upon the movement of prohibited images to his personal Google drive folder, as charged in Count One of the Indictment. Since Count One of the Indictment sufficiently charges Defendant with the crime of Transporting Child Pornography under 18 U.S.C. § 2252(a)(1), his Motion to Dismiss Count One of the Indictment is denied.

## II.  Defendant's Motion for a Bill of Particulars

As an alternative to dismissing Count One of the Indictment, Defendant alleges he is entitled to a bill of particulars "identifying the [G]overnment's theory as to how [he] transported child pornography within the meaning of § 2252(a)(1)." (Suppression Motion at 6.)  He asserts the Government "fails to provide any information as to how Mr. Carver made any of the alleged contraband images on the subject Google account available to others" and "fails to distinguish at all how Mr. Carver's conduct with respect to Count One differs from the conduct associated with the simple possession crimes charged in Counts Two and Three." (<u>Id.</u> at 7.)  The Government argues no bill of particulars is required, as the Indictment provides sufficient

information to inform Defendant of the nature of the charges against him.  (Opp'n at 14-15).  According to the Government, the Indictment "sets forth all of the material aspects of the crime of transportation" and "cites and tracks the language of the relevant statutes" by "identif[ying] the elements of the offense charged, as well as the time period, location and nature of the crime alleged."  (Id. at 15.)  The Court agrees with the Government that Count One provides information sufficient to inform Defendant of the nature of the charges against him, to avoid unfair surprise, and to prevent double jeopardy.  Accordingly, Defendant's motion for a bill of particulars is denied.

A. Legal Standard

    Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to seek a bill of particulars to enable him to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."  United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); see also United States v. Wilson, 493 F. Supp. 2d 364, 369 (E.D.N.Y. 2006).  "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." United States v. Chen, 374 F.3d 151, 163 (2d Cir. 2004) (quoting United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); (internal quotation marks omitted)).  Thus, "[t]he applicable standard for

whether a bill of particulars should issue is not whether the information sought would be helpful to the defense, but whether it is necessary." United States v. Taylor, 17 F. Supp. 3d 162, 178 (E.D.N.Y. 2014), aff'd, 802 F. App'x 604 (2d Cir. 2020).  The defendant bears the burden of showing "the information sought [in a bill of particulars] is necessary and that [the defendant] will be prejudiced without it." United States v. Donovan, No. 20-CR-374, 2021 WL 5819915, at *4 (E.D.N.Y. Dec. 6, 2021) (quoting United States v. Fruchter, 104 F. Supp. 2d 289, 312 (S.D.N.Y. 2000) (internal quotation marks omitted)).

   B. Analysis

      Defendant falls short of showing he is entitled to a bill of particulars.  First, as discussed at length supra, the Government need not prove Defendant made child pornography available to others in order to charge Defendant with transportation of child pornography.  Rather, the Government need only prove that Defendant "transported" the images via a "facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mail[]." 22 U.S.C. § 2225(a)(1).  Accordingly, the Defendant is not entitled to a bill of particulars particularizing the Government's theory as to how he made images available to others.  Moreover, the Indictment is clear, specific, and non-duplicative.  Count One of the Indictment elucidates that Defendant is being charged with

23

transporting child pornography by virtue of his upload of certain images to a Google account which he controlled.  (Indictment at 1.)  It further specifies the date on which Defendant transported such images.  Thus, Count One complies with Rule 7(c)'s requirement that an indictment set forth a "plain, concise and definite written statement of the essential facts constituting the offense."  FED. R. CRIM. P. 7(c).

Moreover, despite Defendant's contentions to the contrary, the plain language of the Indictment differentiates the acts charged in Count One from Counts Two and Three, which charge Defendant with possession of child pornography.  To point out the obvious, Counts Two and Three are different from Count One because they: are possession charges; involve acts performed on different dates; and — with respect to Count Three — relate to images stored in an entirely different online storage platform.  (Compare Indictment Count One, with Counts Two and Three.)  Moreover, Defendant is not entitled to early disclosure of the Government's theory as to how he is guilty of the crimes alleged.  See United States v. Wilson, 493 F. Supp. 2d 364, 370 (E.D.N.Y. 2006) ("A bill of particulars is not a discovery device and is not meant to force the government to disclose its evidence or its legal theory.")  The Indictment has provided Defendant with sufficient information as to the nature of the crimes alleged against him, and to prevent surprise and double jeopardy under the standard set

forth in <u>United States v. Bortnovsky</u>.  820 F.2d 572, 574 (2d Cir. 1987).  Accordingly, Defendant's request for a bill of particulars is denied.

III. <u>Defendant's Motion to Suppress</u>

> To protect the Fifth Amendment right against self-incrimination, the Supreme Court in <u>Miranda v. Arizona</u> ruled that police may not interrogate a suspect who has been taken into custody without first warning the person "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

<u>United States v. Newton</u>, 369 F.3d 659, 668 (2d Cir. 2004) (quoting <u>Miranda v. Arizona</u> 86 U.S. 436 (1996)).  To be entitled to <u>Miranda</u> warnings, an individual must be: (1) in custody; and (2) subject to interrogation.  <u>See</u> <u>United States v. Chandler</u>, 164 F. Supp. 3d 368, 385 (E.D.N.Y. 2016); <u>see also</u> <u>United States v. FNU LNU</u>, 653 F.3d 144, 148 (2d Cir. 2011) (identifying the two-part inquiry as to whether a person must be Mirandized).  If a suspect is entitled to <u>Miranda</u> warnings but is not so warned, "the prosecution is barred from using statements obtained during the interrogation to establish its case in chief."  <u>Newton</u>, 369 F.3d at 668.

    A. <u>Legal Standard</u>

        1. <u>Custodial Interrogation</u>

For the purposes of Miranda, a person is "in custody" when circumstances exist such that "a reasonable person in the suspect's position would have understood [him]self to be subjected to restraints comparable to those associated with formal arrest." United States v. Yilmaz, 508 F. App'x 49, 51 (2d Cir. 2013) (citing FNU LNU, 653 F.3d at 148); Newton, 369 F.3d at 671 (stating the objectivity of the applicable standard). It is not enough that a reasonable person would not thought himself free to leave; rather, "a court must ask whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Newton, 369 F.3d at 672 (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). If the answer to that follow-up question is yes, only then is the person "in custody for practical purposes and entitled to the full panoply of protections prescribed in Miranda." Id. (internal quotations omitted).

In determining whether a person is "in custody," courts evaluate the circumstances surrounding the interrogation. See United States v. Vado, 87 F. Supp. 3d 472, 478 (S.D.N.Y. 2015). In so doing, courts consider "the duration and location of the interrogation, whether the officers used restraints, whether weapons were present or drawn, and whether the officers told the suspect he was free to leave or under suspicion." Yilmaz, 508 F. App'x at 51. Thus, for a court to find a person "in custody" in

the absence of a formal arrest, "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or allow the suspect to do so." United States v. Hall, 421 F.2d 540, 545 (2d Cir. 1969). Moreover, "[a]n interrogation occurs when a suspect 'is subjected to either express questioning or its functional equivalent' and his statements are 'the product of works or actions on the part of the police' that were 'reasonably likely to elicit an incriminating response.'" United States v. Familetti, 878 F.3d 53, 57 (2d Cir. 2017) (quoting Rhode Island v. Innis, 446 U.S. 291, 300-01, 303 (1980)).

        B. Analysis

        Considering the facts and circumstances surrounding the questioning of Defendant during the lawful search of his home, and the aforementioned factors proscribed in Yilmaz, the Court finds Defendant was not "in custody" such that Miranda warnings were required prior to questioning. First, and significantly, Defendant was questioned in his own home. "While not dispositive, that fact militates against a finding that defendant was in custody." United States v. Benedict, 104 F. Supp. 2d 175, 178 (W.D.N.Y. 2000); see also United States v. Faux, 828 F.3d 130, 135-36 (2d Cir. 2016) ("[C]ourts rarely conclude, absent a formal arrest, that a suspect questioned in [his] own home is 'in

custody.'");Newton, 369 F.3d at 675 ("[A]bsent an arrest,
interrogation in the familiar surroundings of one's own home is
generally not deemed custodial."). Second, the length of
questioning was relatively short. According to Defendant, he was
questioned for approximately an hour and 20 minutes, and law
enforcement left Defendant's home approximately two hours after
the search began. (Carver Decl. ¶¶ 7-9, 12, 16, 18). This length
of time is not so long as to indicate that Defendant was in custody.
See Faux, 828 F.3d at 138-39 (finding two-hour interview to be
non-custodial); United States v. Vado, 87 F. Supp. 3d 472, 479
(S.D.N.Y. 2015) (finding 40-minute interview to be non-custodial).
Moreover, during the search and questioning, Defendant was moved
from room to room, seemingly to permit officers to search his home
without interference. (See Carver Decl. ¶ 8) ("During the time
the officers were questioning me in the first-floor office, I could
hear the other officers moving loudly throughout my home."). Once
questioning ceased, Defendant waited for 45 minutes, without being
questioned, for officers to finish executing the search warrant.
(Id. ¶¶ 16-18). Third, no weapons were drawn or displayed by law
enforcement. See FNU LNU, 653 F.3d at 153 (instructing courts
must evaluate "whether the officers used restraints; whether
weapons were present and especially whether they were drawn" when
determining whether a person is "in custody" under Miranda).
Finally, Defendant was neither physically restrained nor

threatened with physical restraint. Id. Under these circumstances, no reasonable person would believe he was "subjected to restraints comparable to those associated with formal arrest." United States v. Yilmaz, 508 F. App'x 49, 51 (2d Cir. 2013).

Defendant points to certain statements by law enforcement officers in support of his contention that he was in custody. In particular, he asserts law enforcement officers told him he: (1) would not be going to work on the date of the search; (2) could not go to the bathroom to flush the toilet and should instead "stay on the couch"; and (3) could not speak to his wife. (Suppression Support Memo at 7, 9.) Defendant also contends there were many law enforcement officers in close proximity to him and stationed in a manner which would have required him to walk past the officers in order to leave. (Id. at 7.) While, at first blush, these factors appear to favor Defendant's claim that he was in custody for the purposes of Miranda, they do not disturb the Court's overall assessment of the circumstances presented, i.e., that Defendant was not curtailed in a manner akin to formal arrest.

In that vein, United States v. Faux is instructive. See 828 F.3d 130 (2016). In Faux, law enforcement arrived at defendant's home to execute a search warrant just as she and her husband were about to depart on a vacation to Mexico. See id. at 132-133. The warrant permitted agents to search billing and

financial records in connection with alleged Medicare and insurance fraud. Id. at 132. On the date the warrant was executed, 15 law enforcement officers from three different agencies arrived at the defendant's home. Id. Upon their arrival, two officers began questioning the defendant. Id. According to the defendant, when she informed the officers that she was about to leave for vacation, one of the officers replied that she was "not going anywhere." Id. at 133. Defendant's phone was seized, and she was "left with no means to tell the others traveling that the vacation had been interrupted." Id. (internal quotations omitted). Defendant Faux was then questioned for two hours in her dining room. Id. During the execution of the warrant and the interview, the defendant was not permitted to move freely about her home; she was accompanied by an agent to the bathroom and to another room in her home to get a sweater. Id. Law enforcement did not draw weapons, nor did they physically restrain her via handcuffs or other means. Id. Under those circumstances, the Second Circuit held that defendant Faux was not "in custody" such that she was entitled to Miranda warnings and reversed the district court's decision suppressing the defendant's statements. Id. at 138. In so concluding, the Second Circuit found the district court afforded too much weight to: the "aggravating factors" of the interview, including the number of agents in defendant's home; the physical separation of defendant and her husband; defendant's restrictions

on moving about her home; the fact that defendant was never told
she was free to leave; and the agents' signaling to Faux that she
should cancel her vacation.  Id. at 136-138.  The Second Circuit
stated:

> Under our precedents, the circumstances of
> Faux's interrogation militate against a
> finding of custody.  Faux was questioned in
> the familiar surroundings of her home.  She
> was seated at her own dining room table.  She
> was not handcuffed during the interrogation
> and was not arrested at its conclusion.  The
> agents did not display their weapons or
> otherwise threaten or use any physical force.
> Faux claims the agents "held her arm" as they
> escorted her to her dining room for the
> interview; but the agents denied this, the
> district court made no finding one way or the
> other, and the gesture is not described as
> being forceful.  In short, there is no
> evidence that physical force was used, or
> threatened.

Id. at 138.

Here, like the defendant in Faux, Defendant was
questioned in his own home while several agents executed a valid
search warrant.  (See Carver Decl. in toto.)  Although the parties
dispute whether Defendant was explicitly told he was not under
arrest, there is no allegation that Defendant was told that he was
under arrest at any point.  It is undisputed that no weapons were
drawn and Defendant was not physically restrained by handcuffs or
other means.  (Carver Decl. ¶ 12; Opp'n at 20); see United States
v. Familetti, 878 F.3d 53, 61 (2d Cir. 2017) ("Handcuffs are
generally recognized as a hallmark of a formal arrest.") (quoting

Newton, 369 F.3d at 676)).   Similar to defendant Faux, who was
questioned in her dining room, the vast majority of Defendant's
questioning occurred while he sat on his couch in his home.  (See
Carver Decl. ¶¶ 10-12.)  Defendant being questioned in the comfort
of his own home, with no physical threat to his liberty or safety,
weighs heavily in favor of a finding that Defendant was not in
custody.    Newton, 369 F.3d at 675 ("[A]bsent an arrest,
interrogation in the familiar surroundings of one's own home is
generally not deemed custodial.").

Moreover, accepting as true Defendant's assertion that
a law enforcement officer told him he would not be "going to work"
on the day the search was executed,[5] "it is difficult to imagine
that [Defendant] would have [gone to work] given" a search of his
home was underway.  Faux, 828 F.3d at 138; (see also Carver Decl.
¶ 9.)  Likewise, although Defendant's request to flush the toilet
was denied, there is no indication law enforcement would have
prevented Defendant from actually using the restroom or moving
about his home in a manner that did not impede the ongoing search
if he had so requested.  (Carver Decl. ¶ 10.)  In fact, based on
his recollection of the events, it appears Defendant was directed
to move about the home to permit law enforcement to search areas
of his home without obstruction.  (Id. ¶8, 16-18.)   Lastly,

---

[5] The Government does not appear to dispute Defendant's claim that the
statement was made.  (Opp'n at 19-20.)

Defendant's claim that he was "in custody" because he was not permitted to use his phone to call his wife is unavailing. (See Suppression Support Memo at 8.) Law enforcement officers arrived at Defendant's home for the express purpose of executing a search warrant with the goal of seizing "images of child pornography and files containing images of child pornography and records, images, information or correspondence pertaining to the possession . . . in any form wherever they may be stored and found." (Ex. 1 at 6.) Therefore, in order to preserve evidence, it was reasonable for law enforcement officers to prevent Defendant from using electronic devices at the time of the search. See Faux, 828 F.3d 130 (stating monitoring a defendant's movements "had a legitimate law enforcement purpose" which was "to preserve evidence").

Considering the relevant Second Circuit case law, together with Defendant's recitation of the facts and circumstances surrounding his questioning, the Court finds Defendant was not "in custody" at the time of his questioning by law enforcement. In turn, Defendant's Miranda rights did not attach prior to or during his questioning by law enforcement on March 17, 2023; accordingly, Defendant's statements made to the officers during the subject March 17 questioning need not be suppressed. See Newton, 369 F.3d at 672 (instructing Miranda protections are afforded only to persons who are determined to be

33

"in custody").  Moreover, even accepting Defendant's account of the facts, because the Court finds Defendant was not entitled to <u>Miranda</u> warnings prior to questioning, it logically follows there "are no contested issues of fact going to the validity of the search in question" that would require an evidentiary hearing. <u>United States v. Zimmerman</u>, 480 F. Supp. 3d 446, 451 (E.D.N.Y. 2020).  Consequently, Defendant's request for an evidentiary hearing on his Suppression Motion is denied.

IV.  <u>Validity of Defendant's Online Identity Consent Form</u>

Defendant contends his execution of the Online Identity Consent form was not voluntarily and freely given.  (Suppression Support Memo at 12.)  In support of his contention, Defendant points to: (1) his diagnosis with mild Autism Spectrum Disorder ("ASD"), a condition which results in him "shut[ting] down" and "go[ing] along with everyone around [him]"; (2) his lack of prior interactions with law enforcement; and (3) law enforcement statements that giving consent would "make [him] look good" in the eyes of the judge and make things "easier for [him]."  (Id. at 14.)  In opposition, the Government argues consent was voluntarily and freely given as evidenced by: (1) Defendant's age and experience, namely that he is a "nearly 33-year-old adult, working as a mechanical engineer, and a native English speaker"; (2) Defendant not having been handcuffed or subjected to force or threat of force; and (3) law enforcement not making any promises

34

to Defendant, but rather, truthfully stating Defendant's
cooperation with law enforcement could demonstrate his willingness
to assist law enforcement and help himself.  (Opp'n at 28-29.)
The Court agrees; the facts and circumstances make clear
Defendant's signing of the Online Identity Consent Form was
voluntarily and freely given.  Accordingly, Defendant's
Suppression Motion is also denied with respect to evidence derived
from law enforcement's assumption of his online identity.

    A. <u>Legal Standard</u>

      "When a government seeks to justify a search on the basis
of the subject's consent, and the subject is not in custody, the
government must demonstrate that the consent 'was in fact
voluntarily given, and not the result of duress or coercion,
express or implied.'" <u>United States v. Schaefer</u>, 859 F. Supp. 2d
397, 406 (E.D.N.Y. 2012), <u>aff'd,</u> 519 F. App'x 71 (2d Cir. 2013)
(quoting <u>Scheckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973)).  The
Government bears the burden of establishing by the preponderance
of the evidence that consent was freely and voluntarily given.
<u>Id.</u>  "Whether consent was voluntary is 'a question of fact
determined by the totality of all of the circumstances.'" <u>United
States v. Colon-Gentile</u>, No. 12-CR-0777, 2014 WL 2157541, at *3
(E.D.N.Y. May 23, 2014) (quoting <u>United States v. Isiofia</u>, 370
F.3d 226, 231 (2d Cir. 2004)).  In evaluating the totality of the
circumstances, courts consider characteristics of the accused and

the details of the interrogation.  See Schaefer, 859 F. Supp. 2d at 407.  This includes a defendant's age, education or lack thereof, intelligence level, whether he was advised of his constitutional rights, the length of his detention, the repeated or prolonged nature of the questioning, and whether physical punishment was used, such as deprivation of sleep or food.  See id.  The Government has no affirmative obligation to inform citizens of their right to refuse consent to search; however, courts consider it as a factor when determining whether consent was voluntary.  See United States v. Drayton, 536 U.S. 194, 206 (2002) ("The Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search."); Colon-Gentile, 2014 WL 2157541, at *3.  "The 'ultimate question' at issue in determining whether consent to a search was voluntary is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'"  United States v. Pecoraro, 568 F. Supp. 3d 169, 182 (N.D.N.Y. 2021) (citing United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995).

   B. Analysis

   Here, the undisputed facts and circumstances weigh in favor of a finding that Defendant voluntarily consented to officers assuming his online identity.  First, and importantly, Defendant is a 33-year-old mechanical engineer who is a native English

speaker.  (Opp'n. Support Memo at 27.)  Although Defendant claims that his ASD and lack of prior interactions with law enforcement prevented him from giving "voluntary" consent to assume his online identities, the record makes clear that Defendant understood his rights with regard to signing the Online Identity Consent Form, and nonetheless chose to waive them.  See United States v. Mason, 660 F. Supp. 2d 479, 487 (W.D.N.Y. 2009) ("The law is clear that a person's age or mental impairment, while relevant to an analysis of whether police behavior was coercive, will not suffice to show involuntariness if the record as a whole indicates that the person understood his rights and freely chose to waive them."); Pecoraro, 568 F. Supp. at 180 (denying suppression motion where defendant, who was diagnosed with ASD, consented to search and there was no evidence of coercion).

Defendant has brought forth no evidence indicating he did not understand what he was signing.  According to Defendant, he was questioned for approximately an hour and twenty minutes, and law enforcement left his home approximately two hours after the search began.  (Carver Decl. ¶¶ 7-9, 12, 16, 18).  Defendant does not allege the questioning was prolonged or repeated; nor does he allege: weapons were drawn; physical violence was used; or he was deprived of food or sleep.  Rather, Defendant, who was of the appropriate age and education level to read the clear and concise consent form, chose to sign it.  Here, "even a cursory

glance at [the] consent form would have revealed what it was," because at its top, in bold letters, the document was entitled "Federal Bureau of Investigation Consent to Assume Online Identity Authorization Form." (Ex. C); see also United States v. Ofsink, No. 19-CR-0290, 2021 WL 457230, at *6 (E.D.N.Y. Feb. 8, 2021) (adopting magistrate judge's finding that defendant's claim he "didn't know the computer would be searched" was "frankly incredible" in light of defendant having "handed over his password" and having been told law enforcement were "going to take days to look at it"); (see also Ex C). Indeed, the subject form unequivocally stated Defendant had "the right to refuse to allow the FBI to assume [his] . . . online identity." (Ex. C.) Moreover, on April 8, 2022, approximately three weeks after he had been questioned by law enforcement, Defendant signed an additional Online Identity Consent Form on his own volition, thereby underscoring he was keenly aware of his rights, yet decided to again waive them. (Opp'n at 6; Ex. E.)

Defendant claims law enforcement "coerced" him into signing the Online Identity Consent Form by promising him leniency. In particular, Defendant alleges one of the officers told him his signing the form would "make him look good in the judge's eyes" and would make things "easier." (Carver Decl. ¶ 13.) Even assuming, arguendo, the law enforcement officer made such statements, given the other relevant circumstances discussed

38

supra, Defendant has failed to demonstrate he was "coerced" into signing the Online Identity Consent Form.  Moreover, the Court is unpersuaded that these alleged statements offered any promises of leniency to the Defendant.  At most, they suggest a judge may look favorably on Defendant's cooperation; that alone, cannot overcome the plethora of other circumstances indicating Defendant's consent was voluntary.  Instead, the Court finds the law enforcement officers had "a reasonable basis for believing that there had been consent to the search."  Pecoraro, 568 F. Supp. 3d at 182. Accordingly, Defendant's Suppression Motion seeking the suppression of Defendant's executed Online Identity Consent Form and the fruits thereof, is denied.  Relatedly, because Defendant fails to allege a disputed issue of material fact that would disturb the Court's conclusion, his motion for an evidentiary hearing on the issue is also denied.

### CONCLUSION

Accordingly, IT IS HEREBY ORDERED, for the reasons stated herein, Defendant's Dismissal and Suppression Motions (ECF Nos. 28 and 31) are DENIED in their entirety.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: January 3, 2024
Central Islip, New York